# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| ADAM TURNBULL and DAVID ACOSTA, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> ADAM KLEIN, JOEL BROUSSARD, DAVID TREADWELL, RICHARD BURNETT, RYAN CARROLL, STEVE S. HABACHY, DAVID MATLIN, EDDIE WATSON, CRESTVIEW ADVISORS, L.L.C., CRESTVIEW PARTNERS III GP, L.P., CRESTVIEW III USWS, L.P., and CRESTVIEW III USWS TE, LLC, <br><br> Defendants. | C.A. No. 2023-1125-BWD |

## MEMORANDUM OPINION GRANTING MOTIONS TO DISMISS

Date Submitted: September 13, 2024
Date Decided: January 31, 2025

Stephen E. Jenkins, Richard D. Heins, Tiffany Geyer Lydon, ASHBY & GEDDES, P.A., Wilmington, DE; OF COUNSEL: Donald J. Enright, Elizabeth K. Tripodi, Brian D. Stewart, LEVI & KORSINSKY, LLP, Washington, D.C., *Attorneys for Plaintiff Adam Turnbull*.

Blake A. Bennett, COOCH AND TAYLOR, P.A., Wilmington, DE; OF COUNSEL: Michael J. Palestina, KAHN SWICK & FOTI, LLC, New Orleans, LA, *Attorneys for Plaintiff David Acosta*.

Kevin R. Shannon, Jaclyn C. Levy, Callan R. Jackson, POTTER ANDERSON & CORROON LLP, Wilmington, DE; OF COUNSEL: Stephen H. Lee, Joseph D. Cohen, Christopher G. Wawro, PORTER HEDGES LLP, Houston, TX, *Attorneys*

*for Defendants Adam Klein, Joel Broussard, Richard Burnett, David Matlin, and Eddie Watson.*

J. Clayton Athey, David C. Skoranski, PRICKETT, JONES & ELLIOTT, P.A., Wilmington, DE; OF COUNSEL: Edward Han, Alyssa K. Tapper, PAUL HASTINGS LLP, Palo Alto, CA, *Attorneys for Defendants David Treadwell, Ryan Carroll and Steve S. Habachy*.

April M. Ferraro, Noah H. Brown, ABRAMS & BAYLISS LLP, Wilmington, DE; OF COUNSEL: Michael C. Holmes, Jeffrey Crough, Virginia DeBeer, Megan Cloud, VINSON & ELKINS LLP, Dallas, TX, *Attorneys for Defendants Crestview Advisors, L.L.C., Crestview Partners III GP, L.P., Crestview III USWS, L.P., and Crestview III USWS TE, LLC*.

**DAVID, V.C.**

In November 2022, U.S. Well Services, Inc. ("USWS" or the "Company") merged with ProFrac Holding Corp. ("ProFrac") in an all-stock merger (the "Merger"). The plaintiffs in this lawsuit, former stockholders of USWS, seek to challenge the Merger as unfair and the product of breaches of fiduciary duty.

In an effort to overcome the presumption that the Merger should be reviewed under deferential business judgment review, the plaintiffs contend that USWS's largest stockholder, Crestview Advisors, L.L.C., controlled USWS and negotiated unique benefits for itself in the Merger, thereby invoking the more exacting entire fairness standard of review.

At the time of the Merger, Crestview owned 25.7% of USWS's common stock, as well as warrants, notes and preferred stock that, if converted or exercised, could have increased Crestview's voting power to 40.2%. Crestview also had a contractual right to designate two of nine directors on USWS's board of directors, and conceivably wielded influence over one of those directors. For the reasons explained below, this memorandum opinion concludes that such allegations fail to support a reasonable inference that Crestview controlled USWS's board, either generally or specifically in connection with the Merger. The plaintiffs also argue that Crestview, together with several other USWS investors, formed a control group, but the complaint fails to allege facts supporting such an inference.

1

Having failed to plead a conflicted controller transaction, the complaint does not rebut the business judgment rule. The complaint fails to allege that a majority of USWS's nine-member board of directors was interested in, or lacked independence with respect to, the Merger. USWS's directors are exculpated from breaches of the duty of care, and the complaint fails to meet the high bar of pleading bad faith. As a result, and for the reasons detailed below, the complaint must be dismissed.

## I. BACKGROUND[1]

### A. The Parties And Relevant Non-Parties

On November 1, 2022, USWS merged with ProFrac in an all-stock Merger. Am. Compl. ¶ 2.[2] Before the Merger, USWS was a Delaware corporation, headquartered in Houston, Texas, that provided hydraulic fracking services. *Id.*

---

[1] The following facts are taken from Plaintiffs' Verified First Amended Stockholder Class Action Complaint (the "Amended Complaint") and the documents incorporated by reference therein. Verified First Am. S'holder Class Action Compl. [hereinafter Am. Compl.], Dkt. 47; *see Allen v. Encore Energy P'rs, L.P.*, 72 A.3d 93, 96 n.2 (Del. 2013) ("A judge may consider documents outside of the pleadings only when: (1) the document is integral to a plaintiff's claim and incorporated in the complaint . . . ." (citing *Vanderbilt Income & Growth Assocs., L.L.C. v. Arvida/JMB Managers, Inc.*, 691 A.2d 609, 612 (Del. 1996))).

[2] *See also* Transmittal Aff. of April M. Ferraro, Esq. in Supp. of The Crestview Defs.' Opening Br. in Supp. of Their Mot. to Dismiss Pls.' First Am. Verified S'holder Class Action Compl. [hereinafter Ferraro Aff.], Ex. T [hereinafter Proxy], Dkt. 56.

On September 28, 2022, USWS issued a definitive proxy statement on Schedule 14A (the "Proxy") in connection with the Merger. Am. Compl. ¶ 15; *see* Proxy.

¶ 33.  Plaintiffs Adam Turnbull and David Acosta (together, "Plaintiffs") owned shares of USWS common stock at all times relevant to this action.  *Id.* ¶¶ 1, 18–19.

Defendants David Treadwell, Ryan Carroll, Steve Habachy, Joel Broussard, Richard Burnett, Adam Klein, David Matlin, and Eddie Watson (the "Director Defendants") and non-party Kyle O'Neill were the nine members of USWS's board of directors (the "Board") at the time of the Merger.  *Id.* ¶¶ 21–28, 35, 98.  O'Neill also served as Chief Executive Officer and President of USWS.  *Id.* ¶ 35.

Defendant Crestview Advisors, L.L.C. ("Advisors") is a private equity fund that invests in the financial services, media, healthcare, industrial, and energy sectors.  *Id.* ¶ 29.  As of March 28, 2022, Advisors, Crestview Partners III GP, L.P., Crestview III USWS, L.P., and Crestview III USWS TE, LLC (collectively, "Crestview") beneficially owned 25.7% of USWS common stock.  *Id.* ¶¶ 29–32; Ferraro Aff., Ex. M. at 16.  Or, assuming the conversion and exercise of all warrants, notes and preferred stock—which were convertible for up to 18,668,537 shares of USWS common stock—Crestview beneficially owned 40.2% of USWS common stock.  Ferraro Aff., Ex. M at 16.[3]

Non-party TCW Group, Inc. ("TCW") owned 14% of USWS common stock as of March 28, 2022, and held an interest in ProFrac's debt during Merger

---

[3] Crestview's ownership interest was roughly the same at the time of the Merger.  *See* Director OB at 12 n.38; Crestview OB at 25 n.87.

negotiations. Am. Compl. ¶¶ 24, 119, 159–60; Ferraro Aff., Ex. M at 16. Non-parties Dan Wilks and Farris Wilks (the "Wilks Brothers"), through entities affiliated with THRC Holdings, L.P. ("THRC"), controlled ProFrac and beneficially owned 12.8% of USWS common stock as of March 28, 2022. Am. Compl. ¶¶ 36, 161; Ferraro Aff., Ex. M at 16.

Plaintiffs assert that Crestview, alone or as a group with TCW, the Wilks Brothers, and Matlin, controlled USWS and its Board. Am. Compl. ¶¶ 151–63.

## B. USWS Is Formed In A De-SPAC Transaction.

On November 9, 2018, USWS was formed through a "de-SPAC" transaction in which Matlin & Partners Acquisition Corporation ("MPAC"), a special purpose acquisition company affiliated with Matlin, merged with privately held U.S. Well Services, LLC (the "de-SPAC Transaction").[4] *Id.* ¶ 3. USWS emerged as the post-merger entity. *Id.*

As part of the de-SPAC Transaction, MPAC and Crestview entered into a subscription agreement under which Crestview invested $90 million in exchange for USWS common stock, warrants, and options (the "Crestview Subscription Agreement"). *Id.* ¶ 45. Through the Crestview Subscription Agreement, Crestview

---

[4] Before the de-SPAC Transaction, TCW owned "the largest equity position" in USWS Holdings LLC, which owned the outstanding limited liability company interests in U.S. Well Services, LLC. Am. Compl. ¶ 38.

4

acquired 31.3% of USWS common stock—or 35% of USWS common stock, assuming the exercise of warrants—and gained the contractual right to designate two members of the Board so long as Crestview beneficially owned at least 14.3% of USWS common stock.[5] *Id.* ¶¶ 48, 153; Ferraro Aff., Ex. C at 2.

### C. USWS And ProFrac Consider A Possible Combination, But Discussions Stall.

In June 2019, USWS and ProFrac met to discuss a potential transaction involving the companies, but discussions stalled. Am. Compl. ¶ 50.

Months later, at a November investor conference, ProFrac expressed interest in speaking with Klein, a Crestview partner, suggesting "it could make sense for ProFrac and USWS to resume discussions but only if Crestview Partners would be supportive." *Id.* ¶ 51 (emphasis removed); Proxy at 82. Later that month, ProFrac met with Klein, who suggested that a business combination could make sense in the future. Am. Compl. ¶ 53.[6]

---

[5] In connection with the de-SPAC Transaction, the Board increased from five to seven directors. Am. Compl. ¶ 47. The Board comprised two directors designated by USWS Holdings, two directors designated by MPAC, two directors designated by Crestview, and Broussard, who was the Chief Executive Officer of USWS Holdings. *Id.* The Board later expanded from seven to nine directors. *Id.* ¶ 98.

[6] According to the Proxy, ProFrac and USWS continued discussions into December, at which point ProFrac decided that becoming a public company was not an attractive option. Proxy at 82.

More than a year later, on February 19, 2021, ProFrac again contacted USWS to discuss a possible combination. *Id.* ¶ 56. The parties executed a confidentiality agreement and engaged in preliminary due diligence, and on April 1, ProFrac delivered a preliminary, non-binding term sheet to USWS, proposing a combination that valued USWS at $500 million. *Id.* ¶¶ 56–58; Proxy at 82.

The Board met to discuss the non-binding proposal and determined to engage legal and financial advisors to assist in evaluating the proposal. Am. Compl. ¶ 59; Proxy at 82. The Board received an update from management and Piper Sandler. Am. Compl. ¶ 59; Proxy at 82. Piper Sandler informed the Board that ProFrac had engaged Piper Sandler to assist with diligence on a separate, unrelated matter, but the Board nevertheless determined to work with Piper Sandler as the Company's financial advisor. Am. Compl. ¶ 59; Proxy at 82.

On April 8, Piper Sandler delivered a counterproposal to ProFrac on behalf of the Board, but ProFrac did not respond, and conversations once again stalled. Am. Compl. ¶ 60; Proxy at 83. Later that month, ProFrac relayed that it intended to focus on its own business rather than continue to pursue a combination with USWS. Am. Compl. ¶ 61.

---

On March 31, 2020, USWS and Crestview entered into a purchase agreement under which USWS sold, and Crestview purchased, 21,000 shares of Series B Redeemable Convertible Preferred Stock for $21 million. Am. Compl. ¶ 55. On April 2, 2020, Crestview filed an amended Schedule 13D disclosing a 57.93% beneficial interest in USWS. *Id.*

**D. The 2021 NPA**

According to the Proxy, in June 2021, the Board formed a special committee of directors (the "2021 Special Committee") and engaged Piper Sandler to explore alternatives to generate liquidity that could be used to settle an ongoing lawsuit. Proxy at 83.

The 2021 Special Committee's process culminated in a Note Purchase Agreement dated June 24, 2021 (the "2021 NPA"). Am. Compl. ¶ 65; Proxy at 83. Under the 2021 NPA, USWS issued $84 million of Convertible Senior Secured PIK Notes (the "PIK Notes") convertible into shares of USWS common stock (the "Equity Linked Notes") and $22.5 million of PIK Notes convertible into licenses to build three hydraulic fracturing fleets using USWS technology (the "License Linked Notes"). Proxy at 83. THRC purchased $25 million in Equity Linked Notes and ProFrac purchased $22.5 million in License Linked Notes. *Id.*

On June 25, USWS issued an additional $19 million of Equity Linked Notes. *Id.* Crestview purchased $20 million in Equity Linked Notes for cash and another $20 million in Equity Linked Notes in exchange for the cancellation of 15,588 shares of Series A Preferred Stock. *Id.*

The Certificate of Designations for USWS's Series A Preferred Stock provided that no share of Series A Preferred Stock could be converted into more than 248 shares of common stock. Am. Compl. ¶ 64. Under the 2021 NPA, however,

7

the PIK Notes did not contain the same limitation on conversion. *Id.* ¶ 68. Plaintiffs contend that "Crestview did not pay any consideration for the elimination of the conversion limits." Pls.' Answering Br. in Opp. to Defs.' Mots. to Dismiss at 10 [hereinafter PAB], Dkt. 62.[7]

### E.    USWS Converts Series B Preferred Stock Into Common Stock.

On September 14, 2021, the Board approved an amendment to the Certificate of Designations for USWS's Series B Preferred Stock that permitted USWS to convert all outstanding shares of Series B Preferred Stock into shares of common stock under a formula described in the Certificate of Designations. Am. Compl. ¶¶ 74–75. Then, on September 17, USWS exercised its right under the Certificate of Designations to convert all shares of Series B Preferred Stock into common stock (the "Conversion"), resulting in the issuance of 89,479,972 shares of common stock. *Id.* ¶ 76.

---

[7] Plaintiffs allege that the "15,588 shares of Series A Preferred stock exchanged by Crestview could previously have only been converted into 3,865,824 shares" of USWS common stock given the limitation on conversion under the Certificate of Designation. Am. Compl. ¶ 67. However, "[t]he initial conversion price of the $20 million in Exchange PIK Notes was $2.00, meaning that Crestview could convert the Exchange PIK Notes into ten million shares of Class A Common Stock—*i.e.*, roughly six million more shares than the shares of Class A Common Stock into which Crestview's 15,588 shares of Series A Preferred Stock was convertible into immediately prior to the Note Purchase Agreement." *Id.* ¶ 70.

Plaintiffs point out that in the Conversion, additional shares were issued as if the converted shares of Series B Preferred Stock had accrued dividends for another six months, *i.e.*, through April 1, 2022—what Plaintiffs call "Additional Conversion Shares." *Id.* Crestview received 48,912,429 shares of common stock in the Conversion, including 5,562,550 Additional Conversion Shares. *Id.* ¶ 77. Plaintiffs assert that USWS "did not receive any consideration for the Additional Conversion Shares." PAB at 11 (emphasis removed).

**F.     USWS Amends Its Senior Secured Term Loan Credit Facility.**

In January 2022, USWS engaged Piper Sandler to assist with a debt capital markets process to address liquidity, review strategic alternatives, and conduct outreach to counterparties regarding a potential business combination. Am. Compl. ¶¶ 81–82; Proxy at 84. In late January and early February, Piper Sandler contacted ProFrac and four other parties to assess interest in a potential business combination or licensure of USWS's technology. Am. Compl. ¶ 83.[8]

On January 26, the Board formed a special committee of directors (the "January 2022 Special Committee"), consisting of Treadwell, Habachy, Carroll, and Burnett, to negotiate an amendment to USWS's Senior Secured Term Loan Credit

---

[8] On February 9, USWS entered into confidentiality agreements with two other companies, but discussions did not progress further. Proxy at 84. According to the Proxy, Piper Sandler contacted a total of forty-seven potential debt financing sources, but other than THRC, no other parties were interested in lending to USWS. *Id.*; Am. Compl. ¶ 88.

Agreement with Crestview and other lenders (the "Term Loan Agreement"). Am. Compl. ¶¶ 84, 89; Proxy at 85.

The January 2022 Special Committee's process culminated in a February 28, 2022 Consent and Sixth Amendment to the Term Loan Agreement ("Term Loan Amendment"), which allowed USWS to borrow from a new last-out credit facility (the "Term C Loans"). Am. Compl. ¶ 89. In connection with the Term Loan Amendment, affiliates of Crestview and Matlin entered into a side letter with USWS (the "Side Letter") providing that after USWS repaid its two existing credit facilities, USWS would pay the lenders of the Term C Loans a specified "premium upon any repayment, prepayment or acceleration of the Term C Loans" (the "Premium"). *Id.* ¶ 91. The Side Letter stated that the purpose of the Premium was "[t]o induce the Term C Loan Lenders to extend credit to [USWS] on account of the Term C Loans." *Id.* ¶ 92.[9]

As part of the Term Loan Amendment, USWS issued 13,953,488 warrants to Term C Loan lenders (the "February 2022 Warrants"), including 6,976,744 February

---

[9] Plaintiffs allege that "the initial version of the Side Letter, dated February 28, 2022," included higher premiums than those ultimately agreed to. Am. Compl. ¶ 93. Plaintiffs allege that, "[c]uriously, these premiums, which were purportedly 'reasonable and the product of an arm's-length transaction,' were amended just five days later to lower the Premium rates." *Id.* Plaintiffs further allege that "[l]owering the Premium rates after entering into the Term Loan Agreement suggests that the Premium was structured as a hidden interest rather than as an inducement." *Id.* ¶ 94.

2022 Warrants to Crestview for $10 million in Term C Loans. *Id.* ¶¶ 95–96; Proxy at 85, F-173, F-209. The February 2022 Warrants were exercisable into common stock at an exercise price of $1.10 per share, subject to adjustment. Am. Compl. ¶ 95.

On March 1, USWS issued an additional 1,046,511 warrants to Term C Loan lenders (the "March 2022 Warrants," and together with the February 2022 Warrants, the "2022 Warrants"), including 697,674 March 2022 Warrants to Matlin for $1.5 million in Term C Loans. *Id.* ¶ 96; Proxy at 85, F-173, F-209. The March 2022 Warrants were exercisable into common stock at an exercise price of $1.29. Proxy at F-173. Also on March 1, USWS issued to THRC 6,976,744 2022 Warrants for $10 million in Term C Loans. Am. Compl. ¶ 186; Proxy at 85, 106–07.

### G. Plaintiff Turnbull Sends A 220 Demand.

In March 2022, Plaintiff Turnbull delivered a demand to the Board, seeking to inspect USWS's books and records pursuant to Section 220 of the Delaware General Corporation Law (the "220 Demand"). Am. Compl. ¶¶ 8, 170; *see also* Ferraro Aff., Ex. L [hereinafter 220 Demand]. Through the 220 Demand, Turnbull sought books and records concerning the 2021 NPA, the Conversion, and the Term Loan Amendment, for the purpose of investigating whether those transactions were the product of breaches of fiduciary duty and gave rise to derivative claims against Crestview and members of the Board. Am. Compl. ¶¶ 8, 168.

11

**H.    USWS And ProFrac Negotiate The Merger.**

On February 17, 2022, ProFrac delivered a non-binding indication of interest, offering to acquire all outstanding shares of USWS common stock "for a consideration of $280mm to $370mm." *Id.* ¶ 86.[10]  Three months later, on May 25, ProFrac delivered a revised non-binding indication of interest, offering to acquire all outstanding shares of USWS common stock for a mix of cash and ProFrac common stock, representing a total enterprise value of $380 million, or $0.70 per share paid in ProFrac common stock with the assumption of debt and other obligations. *Id.* ¶ 100; Proxy at 85.

The next day, the Board held a special meeting at which USWS management and Piper Sandler discussed the revised indication of interest.  Proxy at 85.  Piper Sandler informed USWS management of the transactions for which it was engaged as an advisor by ProFrac.  Am. Compl. ¶ 102.  On May 31, the Board met with USWS management and Crestview representatives in attendance, and Piper Sandler presented on value.  *Id.* ¶ 105.  Thereafter, USWS management reviewed Piper Sandler's conflicts, discussed them with Treadwell and Broussard, and on June 5, directed Piper Sandler to proceed with providing a fairness opinion.  *Id.* ¶ 102.

---

[10] According to the Proxy, this offer was considered and rejected by the Board.  Proxy at 84.

On June 3, ProFrac delivered another revised indication of interest, proposing to acquire all outstanding shares of USWS common stock for $1.06 per share paid in ProFrac common stock with the assumption of debt and other obligations. *Id.* ¶ 110.

On June 6, the Board held a special meeting with USWS management, advisors, and representatives of Crestview in attendance. *Id.* ¶ 111. Following an executive session, the Board determined to counter with "an exchange ratio of 0.0561 shares of ProFrac Class A Common for each share of USWS, along with a 45-day 'go-shop' period with a termination fee of $3 million during the go-shop and $5 million afterwards." *Id.* ¶ 112.

On June 8, Treadwell emailed Carroll and Habachy (copying Broussard, O'Neill, and Erin Simonson, USWS's Vice President and Corporate Secretary) about forming a special committee of independent directors to evaluate the proposed merger with ProFrac. *Id.* ¶¶ 116, 134. Later that day, the Board executed a unanimous written consent forming a special committee, consisting of Treadwell, Carroll, and Habachy (the "Special Committee"), to evaluate the proposed merger with ProFrac "in light of [Crestview's] large equity stake and debt holdings in USWS and its representation on the USWS Board." *Id.* ¶ 116; Proxy at 87. The Special Committee retained Paul Hastings as legal counsel but did not engage its own financial advisor. Am. Compl. ¶ 122; *see id.* ¶ 116.

13

Between June 8 and June 21, ProFrac negotiated with Crestview and other holders of USWS convertible securities over the treatment of their securities in a potential merger. *Id.* ¶ 115. On June 10, ProFrac sent an indication of interest to Crestview (the "Crestview IOI") proposing to downwardly adjust the conversion price of Series A Preferred Stock into common stock; terminate the 2022 Warrants in exchange for cash; amend the conversion price of the outstanding Equity Linked Notes; and toll interest accruing on the Term C Loans. *Id.* ¶¶ 124–25. The Crestview IOI contemplated the same treatment for all similarly situated holders of each type of USWS security. *Id.* ¶ 126. Thereafter, Klein, on behalf of Crestview, negotiated with ProFrac over the terms of the Crestview IOI. *Id.* ¶¶ 126–27.

On June 13, the Board held a meeting with management, USWS's legal counsel Porter Hedges, Piper Sandler, and Crestview in attendance. *Id.* ¶¶ 112, 130. At the meeting, Piper Sandler disclosed to the Board that it was currently engaged as a buyside advisor for ProFrac for an acquisition that was under a letter of intent. *Id.* ¶ 131. The Board nevertheless determined that Piper Sandler would continue to serve as financial advisor and present a fairness opinion to the Special Committee. *Id.*

Later that day, the Special Committee met with Simonson present. *Id.* ¶ 134. At the meeting, Carroll, who served as a Managing Director and Head of Portfolio Management within the Private Credit Group at TCW, disclosed to the other

14

members of the Special Committee that TCW held an interest in ProFrac's debt. *Id.*
¶¶ 119, 134.

On June 15, the Special Committee met telephonically with Piper Sandler, O'Neill, and Simonson to discuss the status of negotiations with ProFrac. *Id.* ¶ 138. The next day, the Special Committee met with O'Neill and Simonson present, and separately, the full Board met with its advisors, management, and Crestview, to discuss the status of negotiations. *Id.* ¶¶ 141–42. After the meetings, Porter Hedges sent an updated draft of the merger agreement (the "Merger Agreement") to ProFrac's counsel. *Id.* ¶ 142. On June 18, counsel for ProFrac's special committee provided Porter Hedges with revised drafts of the Merger Agreement and other ancillary agreements. *Id.* ¶ 143.

On June 20, the Special Committee met, with O'Neill and Simonson present, to discuss the terms of the draft Merger Agreement. *Id.* ¶¶ 145–46. Piper Sandler presented on value and advised that it could deliver a fairness opinion. *Id.* ¶¶ 147, 149. The Special Committee resolved to recommend that the Board approve the Merger Agreement and related transactions. *Id.* ¶ 149.

According to the Proxy, the Board then met to consider the Merger Agreement. Proxy at 92. Piper Sandler orally presented its financial analysis of the merger. *Id.* Paul Hastings discussed the negotiation and terms of the Merger Agreement, and the Special Committee informed the Board that it had unanimously

15

approved the proposed merger subject to finalizing the transaction documents, a termination fee of no more than $8 million, and the delivery of a fairness opinion from Piper Sandler. *Id.*

The next day, on June 21, Piper Sandler delivered its written fairness opinion, opining that the proposed exchange ratio was fair, from a financial point of view, to USWS. *Id.* at 93. Thereafter, the Special Committee and Board determined that the conditions to their recommendation and approval were satisfied, and the Board, on the recommendation of the Special Committee, approved the Merger Agreement. Am. Compl. ¶ 150; Proxy at 93. That day, the parties finalized and executed the Merger Agreement. Am. Compl. ¶ 150; Proxy at 93.

On June 22, USWS and ProFrac publicly announced that they had entered into the Merger Agreement. Am. Compl. ¶ 14. The Merger Agreement contemplated that each share of USWS common stock would be exchanged for 0.3366 shares of ProFrac common stock, implying consideration of $1.21 per share and representing a 67% premium to USWS's common stock closing price on June 21, 2022. Proxy at 110. In addition, ProFrac repaid approximately $170 million, and assumed approximately $55 million, of USWS's debt. *Id.* at F-64–F-65.

Under the terms of the Merger Agreement, USWS agreed to permit holders of Series A Preferred Stock to convert such shares into shares of USWS common stock pursuant to an optional merger conversion. *Id.* at 148. USWS also agreed to

16

amend the terms of the Equity Linked Notes to provide for their conversion. *Id.* at 149.

In connection with the Merger Agreement, Crestview, THRC, Matlin, other Term C Loan warrant holders, and ProFrac executed a "Warrant Purchase Agreement," under which ProFrac agreed to purchase the 2022 Warrants for $0.176 per warrant. Am. Compl. ¶¶ 186–87; Proxy at vi.[11] In addition, certain USWS stockholders, including Crestview, THRC, Broussard, and Matlin, entered into a "Voting Agreement" with ProFrac, agreeing to support and vote in favor of the Merger Agreement. Proxy at 9, 12, 148; Ferraro Aff., Ex. S at 15.

## I. USWS Stockholders Vote To Approve The Merger.

On September 28, 2022, USWS issued the Proxy in connection with the Merger. Am. Compl. ¶ 15. At a special meeting on October 31, 2022, 63.8% of the outstanding shares of USWS common stock voted to approve the Merger. *Id.* ¶ 194; Ferraro Aff., Ex. V; Proxy at 150. The Merger closed on November 1, 2022. Am. Compl. ¶ 2.

---

[11] Without the Warrant Purchase Agreement, Crestview could have exercised its warrants at the Merger price. Am. Compl. ¶¶ 186–87. Crestview received $600,000 more under the Warrant Purchase Agreement than if it had exercised its warrants prior to the Merger. *Id.*

## J. Procedural History

One year later, on November 6, 2023, Plaintiffs initiated this action through the filing of a Verified Stockholder Class Action Complaint (the "Initial Complaint"). Dkt. 1. Defendants moved to dismiss the Initial Complaint, and on March 4, 2024, Plaintiffs filed the operative Amended Complaint.

Count I of the Amended Complaint alleges that the Director Defendants breached their fiduciary duties by (a) "failing to provide [USWS] stockholders with material information necessary for them to make an informed decision regarding whether or not to vote in favor of the Merger;" (b) "acting to advance the interests of Crestview and ProFrac to the detriment of USWS's minority stockholders;" (c) "causing USWS to enter into the Merger upon terms that were grossly unfair to [USWS's] minority stockholders and to the benefit of Crestview and ProFrac;" (d) "allowing interested [d]irectors to taint the negotiations concerning the terms of the Merger;" and (e) "extracting the release of the derivative claims in the Merger." Am. Compl. ¶ 205. Count II of the Amended Complaint alleges that Crestview was USWS's controlling stockholder and breached its fiduciary duties by "extract[ing] a non-ratable benefit in the Merger." *Id.* ¶¶ 209–15.

On March 18, 2024, Crestview and the Director Defendants moved to dismiss the Amended Complaint (the "Motions to Dismiss").[12] The parties argued the Motions to Dismiss on September 13, 2024. Dkt. 78. This action was reassigned to me on January 8, 2025. Dkt. 80.

## II. ANALYSIS

Defendants have moved to dismiss the Amended Complaint under Court of Chancery Rule 12(b)(6) for failure to state a claim. When reviewing a motion to dismiss under Rule 12(b)(6), Delaware courts "(1) accept all well pleaded factual allegations as true, (2) accept even vague allegations as 'well pleaded' if they give the opposing party notice of the claim, [and] (3) draw all reasonable inferences in favor of the non-moving party . . . ." *Cent. Mortg. Co. v. Morgan Stanley Mortg.*

---

[12] On April 22, 2024, Defendants filed opening briefs in support of the Motions to Dismiss. *See* Defs. Adam Klein, Joel Broussard, Richard Burnett, David Matlin, and Eddie Watson's Opening Br. in Supp. of Their Mot. to Dismiss [hereinafter Director OB], Dkt. 53; Defs. David Treadwell, Ryan Carroll and Steve S. Habachy's Opening Br. in Supp. of Mot. to Dismiss Verified First Am. S'holder Class Action Compl. [hereinafter Special Committee OB], Dkt. 54; The Crestview Defs.' Opening Br. in Supp. of Their Mot. to Dismiss Pls.' First Am. Verified S'holder Class Action Compl. [hereinafter Crestview OB], Dkt. 55. Plaintiffs filed an answering brief in opposition to the Motions to Dismiss on June 5, 2024. Defendants filed reply briefs in further support of the Motions to Dismiss on July 12, 2024. *See* Defs. Adam Klein, Joel Broussard, Richard Burnett, David Matlin, and Eddie Watson's Reply Br. in Supp. of Their Mot. to Dismiss [hereinafter Director RB], Dkt. 65; The Crestview Defs.' Reply Br. in Supp. of Their Mot. to Dismiss Pls.' First Am. Verified S'holder Class Action Compl. [hereinafter Crestview RB], Dkt. 66; Defs. David Treadwell, Ryan Carroll and Steve S. Habachy's Reply Br. in Supp. of Mot. to Dismiss Verified First Am. S'holder Class Action Compl. [hereinafter Special Committee RB], Dkt. 67.

*Cap. Hldgs. LLC*, 27 A.3d 531, 535 (Del. 2011) (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002)).

"A cardinal precept of the General Corporation Law of the State of Delaware is that directors, rather than shareholders, manage the business and affairs of the corporation." *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984) (citing 8 *Del. C.* § 141(a)). "Under the business judgment rule, 'the judgment of a properly functioning board will not be second-guessed and "[a]bsent an abuse of discretion, that judgment will be respected by the courts.""" *In re KKR Fin. Hldgs. LLC S'holder Litig.*, 101 A.3d 980, 989 (Del. Ch. 2014), *aff'd sub nom. Corwin v. KKR Fin. Hldgs. LLC*, 125 A.3d 304 (Del. 2015) (quoting *Orman v. Cullman*, 794 A.2d 5, 20 (Del. Ch. 2002)).[13]

At the pleadings stage, a plaintiff can rebut the business judgment presumption by adequately alleging that (1) a controlling stockholder stood on both sides of the challenged transaction or (2) at least half of the directors who approved the transaction were not disinterested or independent. *See Aronson*, 473 A.2d at 812. In either case, the transaction will be reviewed under the more exacting entire

---

[13] "Enhanced judicial scrutiny under *Revlon* is not implicated in this action because the stock-for-stock merger involved widely-held, publicly traded companies." *KKR Fin. Hldgs.*, 101 A.3d at 989. The parties do not argue that enhanced scrutiny under *Revlon* applies.

fairness standard of review, typically precluding dismissal at the pleadings stage.[14]

Plaintiffs' primary argument here is that Crestview, alone or as a group, controlled USWS and received a non-ratable benefit in the Merger, such that entire fairness should apply. *See* PAB at 37.

### A. The Amended Complaint Fails To Adequately Allege That Crestview Controlled USWS.

"Delaware courts will deem a stockholder a controlling stockholder when the stockholder: (1) owns more than 50% of the voting power of a corporation or (2) owns less than 50% of the voting power of the corporation but 'exercises control over the business affairs of the corporation.'" *In re Tesla Motors, Inc. S'holder Litig.*, 2018 WL 1560293, at *12 (Del. Ch. Mar. 28, 2018) (emphasis removed) (quoting *Kahn v. Lynch Commc'ns Sys., Inc.*, 638 A.2d 1110, 1113–14 (Del. 1994)).

---

[14] Even if a transaction is not approved by disinterested and independent directors, "where no controlling shareholder is involved and a majority of the Company's disinterested shareholders approves the transaction with a fully informed, uncoerced vote[,]" the business judgment standard of review will irrebuttably apply and insulate the transaction from challenge on any ground other than waste. *In re Rouse Props., Inc.*, 2018 WL 1226015, at *2, *11 (Del. Ch. Mar. 9, 2018) (internal quotation marks omitted) (summarizing the *Corwin* doctrine). It does not appear that the Merger here was approved by a majority of disinterested shares. *See* Director OB at 19 (arguing that the Merger was approved by a majority of USWS's stockholders but failing to address whether it was approved by a majority of unaffiliated shares); Special Committee RB at 18 (noting "the parties agree that the Merger was approved by the majority of shares" but failing to argue that it was approved by a majority of unaffiliated shares).

21

At the time of the Merger, Crestview beneficially owned 25.7% of USWS common stock, and also held warrants, notes, and preferred stock that, if exercised or converted, would have increased Crestview's voting power to 40.2%—still less than mathematical control. Am. Compl. ¶ 9; Ferraro Aff., Ex. M at 16. To consider Crestview a controller despite its minority stake, Plaintiffs must adequately plead that Crestview *actually controlled* the business affairs of USWS.

A minority stockholder "is not considered to be a controlling stockholder unless it exercises 'such formidable voting and managerial power that [it], as a practical matter, [is] no differently situated than if [it] had majority voting control.'" *In re Morton's Rest. Gp., Inc. S'holders Litig.*, 74 A.3d 656, 665 (Del. Ch. 2013) (quoting *In re PNB Hldg. Co. S'holders Litig.*, 2006 WL 2403999, at *9 (Del. Ch. Aug. 18, 2006)). Pleading actual control is "no easy task," *Larkin v. Shah*, 2016 WL 4485447, at *13 (Del. Ch. Aug. 25, 2016), and "stockholders with very potent clout have been deemed, in thoughtful decisions, to fall short of the mark." *PNB Hldg. Co.*, 2006 WL 2403999, at *9. A plaintiff may plead actual control by alleging facts supporting an inference that the alleged controller "actually dominated and controlled" the board either (1) "generally" at the time of the challenged transaction or (2) specifically with respect to the challenged transaction. *Rouse Props.*, 2018 WL 1226015, at *12.

22

Plaintiffs contend that the Amended Complaint alleges facts supporting a reasonable inference that Crestview exercised both general control over USWS and transaction-specific control over the Board in connection with the Merger. *See* PAB at 37–47. Plaintiffs also allege that Crestview, along with TCW, the Wilks Brothers, and Matlin, formed a control group that held mathematical voting control over USWS. *See id.* at 47–49. For the reasons explained below, none of these theories support a pleadings-stage inference that Crestview controlled USWS.

**1. The Amended Complaint Fails To Allege Facts Supporting A Reasonable Inference That Crestview Exercised Control Over The Board Generally.**

Plaintiffs first contend that "Crestview held sufficient voting power and director appointments to support an inference of general control at the pleading stage . . . ." PAB at 2.

Plaintiffs urge that "Crestview's ownership interest supports an inference of control." *Id.* at 40. At the time of the Merger,[15] Crestview owned and could vote

---

[15] Plaintiffs point out that when ProFrac submitted its first non-binding indication of interest on February 17, 2022, Crestview owned 37.8% of USWS's common stock, or 54.16% assuming the exercise of other securities. *See* PAB at 40; Am. Compl. ¶ 151; Ferraro Aff., Ex. K at 2. The Board did not counter, and by the time ProFrac delivered a revised non-binding indication of interest on May 25, 2022, Crestview's beneficial ownership interest, assuming the exercise of other securities, had decreased to 40.2%. Am. Compl. ¶¶ 100, 152.

only 25.7% of USWS common stock.  That level of voting power is "not impressive on its own."  *Rouse Props.*, 2018 WL 1226015, at \*18.  Plaintiffs' theory of general control therefore hinges on Crestview's potential voting power had it exercised or converted all of its warrants, convertible notes, and preferred stock.  If it had, Crestview's equity stake would have increased to 40.2%.

Plaintiffs' argument inflates Crestview's voting power by including shares that it did not actually hold.  Under Delaware law, the "*potential* ability to exercise control is not equivalent to the actual *exercise* of that ability."  *In re Sea-Land Corp. S'holders Litig.*, 1987 WL 11283, at \*5 (Del. Ch. May 22, 1987); *see also In re Match Gp., Inc. Deriv. Litig.*, 2024 WL 4372313, at \*3 (Del. Ch. Oct. 2, 2024) ("The mere potential to exercise control is insufficient."); *Klein v. H.I.G. Cap., L.L.C.*, 2018 WL 6719717, at \*13 (Del. Ch. Dec. 19, 2018) (explaining that, although an alleged controller "had the potential to *later* exercise control over the Company[,]" "the 'potential [ability] to exercise control' is not enough to impose fiduciary

Plaintiffs rely on the Delaware Supreme Court's decision in *Olenik v. Lodzinski*, 208 A.3d 704 (Del. 2019), to argue that Crestview's 54.6% beneficial ownership in February 2022 supports an inference of control.  PAB at 40.  In *Olenik*, however, the alleged controller held a majority of the company's voting power "while substantive economic negotiations" took place, then "drop[ped] below majority ownership" before the transaction was finalized.  208 A.3d at 718.  Those negotiations "set the field of play for the economic negotiations to come by fixing the range in which offers and counteroffers might be made." *Id.* at 717.  Here, by contrast, Plaintiffs do not allege that any negotiations occurred before Crestview's economic stake decreased to well below majority control.

24

obligations" (emphasis added) (quoting *Sea-Land Corp.*, 1987 WL 11283, at \*5)).

If "potential" to acquire control were the standard, "any stockholder of means could, at the pleading stage, be saddled with fiduciary duties based purely on its ability to acquire a sufficiently large enough stake in the target to raise an inference of minority blockholder control." *In re GGP, Inc. S'holder Litig.*, 2021 WL 2102326, at \*21 (Del. Ch. May 25, 2021). That is not the law. "The question, rather, is whether it is reasonably conceivable that [the alleged controller] was, *at the time of the Transaction*, a controller." *Id.* (emphasis added). Although Crestview could have increased its voting power by exercising or converting its securities—with

economic consequences[16]—the voting power relevant to the control analysis should be the shares Crestview *actually* held.[17]

Even assuming Crestview's 40.2% as-converted ownership interest is the right metric to consider, however, Plaintiffs' general control allegations still fall

---

[16] Crestview could not have exercised or converted such securities without economic consequence because many were out of the money or subject to restrictions. *See* Crestview OB at 14–18. For example, Crestview's initial warrants had an exercise price of $40.25 per share, and its preferred warrants had an exercise price of $26.81 per share, while shares traded around $1.00, making the warrants significantly out of the money. *See* Proxy at 84, 123, F-148, F-149; Ferraro Aff., Ex. K at 1–2, 9; *id.*, Ex. S at 1. Under those circumstances, it would be more efficient to purchase shares in the open market; and yet our case law makes clear that the ability to purchase additional shares does not support an inference of control. *See, e.g.*, *In re W. Nat'l Corp. S'holders Litig.*, 2000 WL 710192, at *6 (Del. Ch. May 22, 2000) ("[T]he fact that [a minority shareholder] *could* acquire a numerical majority stock interest in [the company] in the open market is not sufficient to convert its status as a substantial minority shareholder to that of a fiduciary.").

As Defendants also note, "the 40.2% calculation reflects a hypothetical scenario for reporting purposes that does not map onto the practical realities of voting power over USWS" because Plaintiffs' allegations do not account for Crestview's equity interest if all other securityholders exercised or converted the same types of securities. Crestview OB at 18.

[17] Plaintiffs cite *In re Cysive, Inc. Shareholders Litigation*, 836 A.2d 531 (Del. Ch. 2003), as support for the notion that the Court should consider convertible securities when assessing voting power. *See* PAB at 40. In *Cysive*, the Court noted that, "[w]hen considering options, th[e] [control] group—taken together—controlled about 40% of the voting equity," but did not state to what degree the options factored into the control analysis. 836 A.2d at 535. The options obviously were not dispositive, as the Court relied on various indicia of control—the alleged controller (i) had a "subordinate" on the board, (ii) had family members who served as company executives, and (iii) was "Chairman and CEO of Cysive, and a hands-on one, to boot" who had been "involved in all aspects of the company's business, was the company's creator, and ha[d] been its inspirational force." *Id.* at 552. On the other hand, in *O'Reilly v. Transworld Healthcare, Inc.*, 745 A.2d 902 (Del. Ch. 1999), the alleged controller owned 49% of the common stock with "an option to purchase another 2%," and yet the Court did not find his voting power dispositive and instead looked to other indicia of actual control. *Id.* at 913.

26

short. Plaintiffs urge that a 40% equity interest is a "large enough block . . . to be the dominant force in any contested [USWS] election,"[18] but that level of voting power still does not, on its own, give rise to a reasonable inference of control. *See, e.g.*, *Rouse Props.*, 2018 WL 1226015, at *19–20 (concluding that a complaint did not adequately allege that a 33.5% stockholder was a controller); *Superior Vision Servs., Inc. v. ReliaStar Life Ins. Co.*, 2006 WL 2521426, at *1–2, *5 (Del. Ch. Aug. 25, 2006) (concluding that a complaint did not adequately allege that a 44% stockholder was a controller); *W. Nat'l Corp.*, 2000 WL 710192, at *1, *6 (finding on a motion for summary judgment that a 46% stockholder was not a controller); *Sea-Land Corp.*, 1987 WL 11283, at *4–5 (concluding that a complaint did not adequately allege that a 39.5% stockholder was a controller).

Beyond Crestview's voting power, Plaintiffs allege only that Crestview held a contractual right to designate two of nine directors on the Board, and that Crestview actually dominated three directors—Klein, Watson, and Burnett—at the time of the Merger.[19] PAB at 41–44.

---

[18] PAB at 40 (quoting *Cysive*, 836 A.2d at 551–52).

[19] Plaintiffs argue that "Crestview controlled three of the eight members of the Board during the majority of the Merger Process, and three of the nine following the last-second appointment of O'Neill in late May 2022." PAB at 41. Gauged against an eight- or nine-member Board, Plaintiffs' general control allegations fail.

While the Amended Complaint adequately alleges that Klein, a Crestview partner, conceivably was beholden to Crestview,[20] it does not cast doubt on the independence and disinterestedness of either Watson or Burnett. Plaintiffs argue that the Amended Complaint supports an inference that Watson was beholden to Crestview because he was designated by Crestview and depended on his directorship for a "significant" portion of his income, as he was retired. *Id.* at 43–44. Our law makes clear, however, that "[m]erely because a director is nominated and elected by a large or controlling stockholder does not mean that he is necessarily beholden to his initial sponsor." *Frank v. Elgamal*, 2014 WL 957550, at *22 (Del. Ch. Mar. 10, 2014); *see also, e.g.*, *Rudd v. Brown*, 2020 WL 5494526, at *12 (Del. Ch. Sept. 11, 2020) ("[A] director's independence is not compromised by virtue of his status as a stockholder appointee."). And "[t]he fact that [a director] is retired and the director position is his sole source of current employment does not give rise to a reasonable inference that his [director] fees are material to him." *Simons v. Brookfield Asset Mgmt. Inc.*, 2022 WL 223464, at *15 (Del. Ch. Jan. 21, 2022); *see also Chester Cty. Empls.' Ret. Fund v. New Residential Inv. Corp.*, 2017 WL 4461131, at *9 (Del. Ch. Oct. 6, 2017) (explaining that a contrary holding "essentially would be a blanket determination that all retired board members lack independence[,]" which is not

---

[20] *See* Director RB at 12 ("[A]t this stage the Director Defendants do not dispute Plaintiffs' assertion that Klein lacked independence from Crestview . . . .").

28

Delaware law). The barebones allegations of the Amended Complaint therefore do not give rise to a reasonable inference that Watson was beholden to Crestview.

In addition, the Amended Complaint alleges that Burnett was beholden to Crestview because he served as the President and Chief Executive Officer of Silver Creek Exploration, a joint venture between Crestview and non-party B-29 Investments. Am. Compl. ¶¶ 23, 84. The Amended Complaint asserts that Silver Creek's five-member board of directors included three Crestview "representatives," but does not allege facts supporting an inference that those purported "representatives" themselves were beholden to Crestview. *Id.* ¶ 23. With only conclusory allegations of Crestview's control at Silver Creek, the Amended Complaint does not support a reasonable inference that Crestview wielded "unilateral power" over Burnett's employment. *See Benihana of Tokyo, Inc. v. Benihana, Inc.*, 891 A.2d 150, 177 (Del. Ch. 2005) ("This Court will not find a director beholden unless the purported controlling person has 'unilateral' power to substantially affect the director." (quoting *Telxon Corp. v. Meyerson*, 802 A.2d 257, 264 (Del. 2002))), *aff'd*, 906 A.2d 114 (Del. 2006). Similarly, the Amended Complaint alleges that Burnett served on the audit committee of Select Energy Services, a company in which Crestview holds a 19.3% investment. Am. Compl. ¶ 23. But again, the Amended Complaint fails to allege facts supporting an inference that Crestview held sway over Burnett's role at Select Energy Services—the fact that

29

Burnett served on the audit committee of a company in which Crestview is a minority investor "does not, alone, move the needle." *Flannery v. Genomic Health, Inc.*, 2021 WL 3615540, at *16 (Del. Ch. Aug. 16, 2021).

In total, Plaintiffs' general control theory amounts to allegations that Crestview (1) held 25.7% of USWS's voting power; (2) had a contractual right to designate two of nine directors to the Board; and (3) wielded influence over one director.[21] Those allegations do not support an inference that Crestview exercised general control over the Board. *See, e.g.*, *Flannery*, 2021 WL 3615540, at *14 (concluding that a complaint did not adequately allege that a 25% stockholder that held only two of eight board seats was a controller); *Larkin*, 2016 WL 4485447, at *14–15 (concluding that a complaint did not adequately allege that a 23.1% stockholder with three affiliated directors on a nine-member board was a controller); *Morton's Rest. Gp.*, 74 A.3d at 660, 665 (concluding that a complaint did not

---

[21] Plaintiffs also identify a disclosure in USWS's annual report that "[c]ertain of our principal stockholders have significant influence over us." Am. Compl. ¶ 155(a). That disclosure does not mention Crestview, but even if it did, it would "[a]t best, . . . apprise[] stockholders of the obvious fact that [Crestview's sizeable] minority interest might potentially allow it to 'influence' corporate policies and strategies," but that "does not alone support an inference of actual control." *Rouse Props.*, 2018 WL 1226015, at *19.

adequately allege that a 27.7% stockholder with two employees as directors on a ten-member board was a controller).[22]

As a result, to succeed on their entire fairness theory, Plaintiffs must adequately allege that Crestview controlled the Merger process.

### 2. The Amended Complaint Fails To Allege Facts Supporting A Reasonable Inference That Crestview Controlled The Merger Process.

To establish transaction-specific control, a plaintiff must show that the stockholder "exercise[d] actual control over the board of directors during the course of a particular transaction[.]" *W. Nat'l Corp.*, 2000 WL 710192 at *20. The Amended Complaint here fails to allege facts supporting an inference that Crestview conceivably "dominated or controlled [the Board's] 'corporate decision-making process[.]'" *Rouse Props.*, 2018 WL 1226015, at *15 (quoting *In re Crimson Expl. Inc. S'holder Litig.*, 2014 WL 5449419, at *11 n.66 (Del. Ch. Oct. 24, 2014)).

Plaintiffs raise three arguments to support their theory of transaction-specific control. First, Plaintiffs seize on a statement in the Proxy recounting that in 2019,

---

[22] *See also Rouse Props.*, 2018 WL 1226015, at *19–20 (concluding that a complaint did not adequately allege that a 33.5% stockholder whose designees held three board seats was a controller); *Superior Vision Servs., Inc.*, 2006 WL 2521426, at *1, *2 n.12, *5 (concluding that a complaint did not adequately allege that a 44% stockholder whose designees held two of five board seats was a controller); *Sea-Land Corp.*, 1987 WL 11283, at *4–5 (concluding that a complaint did not adequately allege that a 39.5% stockholder with the right to nominate three directors to stand for election at an annual meeting was a controller).

31

three years before the Merger, ProFrac asked to meet with Klein because "it could make sense for ProFrac and USWS to resume discussions but only if Crestview Partners would be supportive." Am. Compl. ¶ 51 (emphasis removed). According to Plaintiffs, ProFrac recognized that "Crestview alone had the power to say no to potential buyers and extract additional consideration for itself." PAB at 46. But "[c]onsideration of controller status focuses on the alleged controller, and whether it effectively *controls the board of directors* so that it also controls disposition of the interests of the unaffiliated stockholders[.]" *Sciabacucchi v. Liberty Broadband Corp.*, 2017 WL 2352152, at *17 (Del. Ch. May 31, 2017) (emphasis added). The fact that *the buyer* approached Crestview does not support an inference that Crestview controlled *the Board*. *See W. Nat'l Corp.*, 2000 WL 710192, at *8 (explaining that a stockholder's ability to "'veto' a business combination . . . is not particularly probative of whether [it] exercises actual control over the business and affairs of the corporation[,]" and that soliciting a stockholder's view does not "indicate a relationship of domination and control" over the board).

Next, Plaintiffs suggest that the Board's decision to form the Special Committee concedes that USWS management, the Board, and ProFrac all recognized that Crestview was a controller. PAB at 46–47. The Proxy states that the Board formed the Special Committee due to "Crestview Partners' large equity stake and debt holdings in USWS and its representation on the USWS Board." Am.

32

Compl. ¶ 155(c). Forming a special committee serves as "evidence of sound corporate governance[,]" not control—and it *limits* a stockholder's ability to exercise transaction-specific control. *Rouse Props.*, 2018 WL 1226015, at *19. "[T]o hold otherwise might discourage fiduciaries from employing these important measures for fear they might unwittingly signal that they perceive a minority blockholder with whom they are dealing to be a controller." *Id.*

Finally, Plaintiffs point out that during the Merger process, Crestview representatives attended at least five Board meetings, including one that the Proxy failed to disclose. Am. Compl. ¶¶ 105, 111, 130, 142, 144. Plaintiffs argue that, by attending these meetings, Crestview was positioned to "tank" the Merger if unsatisfied with the terms of the deal. PAB at 46. Without additional allegations of what Crestview said or did at those meetings, Crestview's attendance on its own does not support an inference of control. *See Patel v. Duncan*, 2021 WL 4482157, at *14 (Del. Ch. Sept. 30, 2021, revised Oct. 4, 2021) (holding that a stockholder's "representatives' passive presence at Board meetings discussing the Challenged Transaction" did not support an inference of control, noting the "stark contrast" to other cases "where the alleged controllers were deeply involved in negotiating and structuring the challenged transactions"), *aff'd*, 277 A.3d 1257 (Del. 2022); *Sea-Land Corp.*, 1987 WL 11283, at *1–2, *5 (concluding that a complaint failed to adequately allege that a 39.5% stockholder was a controller despite its attendance at

33

board meetings).  Critically, the Amended Complaint does *not* allege that Crestview "steered the negotiations or otherwise dominated" the Board—in fact, the Amended Complaint does not allege *any* facts about Crestview's conduct at Board meetings, let alone the type of "overt or even subtle bullying" that this Court has found to support a reasonable inference of control.  *Flannery*, 2021 WL 3615540, at \*15; *Larkin*, 2016 WL 4485447, at \*15.

For these reasons, Plaintiffs have failed to adequately allege that Crestview exercised transaction-specific control over the Board with respect to the Merger.

### 3. The Amended Complaint Fails To Allege Facts Supporting A Reasonable Inference That Crestview Was Part Of A Control Group.

In a final effort to establish Crestview's status as a controlling stockholder, Plaintiffs contend that even if Crestview did not control USWS on its own, it did so as part of a "control group" with several other stockholders whose combined equity interests represented majority voting control.

Delaware "law recognizes that multiple stockholders together can constitute a control group exercising majority or effective control, with each member subject to the fiduciary duties of a controller."  *Sheldon v. Pinto Tech. Ventures, L.P.*, 220 A.3d 245, 251 (Del. 2019).  To adequately allege that a group of stockholders formed a control group, a plaintiff must plead facts supporting an inference that those stockholders were "connected in some legally significant way—such as by contract,

34

common ownership, agreement, or other arrangement—to work together toward a shared goal." *Id.* (quoting *Crimson Expl.*, 2014 WL 5449419, at *15 (cleaned up)). A "legally significant" connection must be more than a "mere concurrence of self-interest among certain stockholders"; it requires "some indication of an actual agreement," even if that agreement is not written or formalized. *Id.* at 252 (first quoting *Carr v. New Enter. Assocs. Inc.*, 2018 WL 1472336, at *10 (Del. Ch. Mar. 26, 2018); and then quoting *Crimson Expl.*, 2014 WL 5449419, at *15).

Plaintiffs contend that Crestview, TCW, the Wilks Brothers, and Matlin should be deemed a control group. PAB at 47–49. Citing *Garfield v. BlackRock Mortgages Ventures, LLC*[23] and *In re Hansen Medical, Inc. Stockholder Litigation*,[24] Plaintiffs assert that these investors' "historical ties" and "transaction-specific

---

[23] 2019 WL 7168004 (Del. Ch. Dec. 20, 2019). "*Garfield* . . . involved extensive historical ties between the alleged controllers, including their 'ten-year history of co-investment' in the company, which they 'decided to start . . . together as the Company's founding sponsors,' and the company's repeated use of defined terms to interchangeably and collectively refer to the two entities in its LLC agreement and a litany of public filings." *Patel*, 2021 WL 4482157, at *12 (quoting *Garfield*, 2019 WL 7168004, at *9).

[24] 2018 WL 3025525 (Del. Ch. June 18, 2018). "In *Hansen*, the plaintiff alleged extensive historical ties between the alleged controllers, including: their 'long history of cooperation and coordination' spanning 'almost a quarter of a century'; their twenty-one year history of 'coordinating their investment strategy in at least seven different companies'; their self-designation as a 'group' in SEC filings unrelated to the company; their involvement as the only participants in a private placement which made them the company's largest shareholders; and the company's grouping of them in several related documents." *Patel*, 2021 WL 4482157, at *12 (quoting *Hansen*, 2018 WL 3025525, at *7).

35

coordination" demonstrate an agreement through which they controlled USWS. *Id.* at 48.

One obvious problem with this theory is that the Amended Complaint does not allege even a concurrence of self-interest between Crestview and the Wilks Brothers (ProFrac's controllers), who sat on opposite sides of the bargaining table when negotiating treatment of Crestview's securities in the Merger. *See In re USG Corp. S'holder Litig.*, 2020 WL 5126671, at \*16 (Del. Ch. Aug. 31, 2020) (concluding that a complaint failed to support a reasonable inference of a control group between the buyer and the seller's largest stockholder in a merger because their interests diverged regarding price), *aff'd sub nom. Anderson v. Leer*, 265 A.3d 995 (Del. 2021); *Almond for Almond Fam. 2001 Tr. v. Glenhill Advisors LLC*, 2018 WL 3954733, at \*26–27 (Del. Ch. Aug. 17, 2018) (rejecting a control group theory where one member "actually stood on the opposite side of the negotiating table," indicating a "misalignment of interest").

Even if Crestview and the Wilks Brothers were not directly adverse in Merger negotiations, the Amended Complaint does not otherwise allege facts supporting an inference that they, along with TCW and Matlin, formed a control group. To support this theory, Plaintiffs point to what they describe as "myriad facts regarding the history of coordination and cooperation among Crestview, TCW, the Wilks Brothers, and Matlin in running and financing" USWS. PAB at 48. Notably, the

Amended Complaint does *not* allege that the purported control group members had a history of coordinating on investments other than USWS.[25] Instead, Plaintiffs' allegations focus entirely on the alleged control group members' involvement *at USWS*. They assert that the alleged control group members' participation in the de-SPAC Transaction and later financing transactions supports a finding of a control group. *Id.* at 48.

As a result of the de-SPAC Transaction, the Board comprised two directors designated by MPAC, an entity affiliated with Matlin; two directors designated by Crestview; and two directors designated by USWS Holdings, an entity in which TCW held the "largest equity position." Am. Compl. ¶¶ 37–38, 47. But the fact that some members of the alleged control group negotiated designation rights in the same

---

[25] *Compare Hansen*, 2018 WL 3025525, at *7 (concluding that the complaint supported an inference of a control group where the members had a twenty-one-year history of coordinating investment strategy in at least seven different companies), *with Patel*, 2021 WL 4482157, at *12 (explaining that the alleged group members' historical ties were "weaker" because beyond the subject company, the members were alleged to have crossed paths only once in another transaction), *and Sheldon v. Pinto Tech. Ventures, L.P.*, 2019 WL 336985, at *9 (Del. Ch. Jan. 25, 2019) (concluding that a complaint failed to allege a control group where plaintiffs failed to allege that all members of the group invested together in any other company or that all members coordinated their investments; noting that allegations that "merely indicate that venture capital firms in the same sector crossed paths in a few investments" are "different from the 'long history of cooperation and coordination' in *Hansen*" (quoting *Hansen*, 2018 WL 3025525, at *7)), *aff'd*, 220 A.3d 345 (Del. 2019).

transaction does not support an inference that they formed a control group.[26]

Plaintiffs do not even attempt to allege that the Wilks Brothers had any involvement in the de-SPAC Transaction.[27] And the fact that after the de-SPAC Transaction, the alleged control group members continued to purchase USWS stock and other securities through various financings in which other investors also participated, similarly does not support an inference of a control group.[28]

---

[26] *See, e.g.*, *Patel*, 2021 WL 4482157, at \*3–4, \*13 (concluding that allegations that two private equity firms that collectively held 63% of the company's stock and were parties to a stockholders' agreement that enabled the firms to designate and elect a majority of the directors on the board were not enough to support an inference of a control group); *van der Fluit v. Yates*, 2017 WL 5953514, at \*6 (Del. Ch. Nov. 30, 2017) (concluding that allegations that two venture capital firms who were parties to an investor rights agreement signed in connection with a financing round did not support an inference of a control group); *Sheldon*, 220 A.3d 245, 253–54 (concluding that allegations that venture capital firms that were bound by a voting agreement that gave them the right to appoint three directors, with those directors choosing two additional directors, and to "hand-pick[]" the Chief Executive Officer of the company, did not support an inference of a control group).

[27] *See, e.g.*, *van der Fluit*, 2017 WL 5953514, at \*6 (noting that not all of the alleged members of a control group were parties to a tender and support agreement and finding no reasonable inference of a control group); *Sheldon*, 220 A.3d at 255 (concluding that a complaint failed to support an inference of a control group where plaintiffs failed to identify any instance in which all three alleged group members participated in any investment).

[28] *See, e.g.*, *Riskin v. Burns*, 2020 WL 7973803, at \*17–18 (Del. Ch. Dec. 31, 2020) (concluding that allegations that investors who both invested in a financing round that bound them to an investors' right agreement and voting agreement failed to support an inference of a control group); *Silverberg v. Padda*, 2019 WL 4566909, at \*2, \*6 (Del. Ch. Sept. 19, 2019) (concluding that allegations that investors participated in the same financing transactions and purchased securities with similar rights did not support an inference of a control group); *van der Fluit*, 2017 WL 5953514, at \*6 (rejecting a control group theory where the alleged group members were signatories to an investors' rights

38

Alternatively, Plaintiffs argue that the Amended Complaint adequately alleges "transaction-specific coordination" in which the alleged control group members cooperated with one another to prioritize their collective interests in the Merger itself. *See* PAB at 48–49. Plaintiffs allege that ProFrac asked for Crestview's support in early merger discussions, and ultimately negotiated a deal that uniquely benefitted Crestview, TCW, the Wilks Brothers, and Matlin. Am. Compl. ¶¶ 51, 123–28, 156–63. But again, the Amended Complaint does not allege any agreement among the members of the supposed control group with respect to the Merger. Plaintiffs simply conflate consensus among the parties in approving the Merger with the act of forming a group. *See Silverberg*, 2019 WL 4566909, at *6–7 (distinguishing an act of consensus from the formation of a group).

Taken together, Plaintiffs' allegations of minimal historical ties, and consensus rather than agreement, fail to support an inference of a control group.

\* \* \*

For the reasons explained above, the Amended Complaint fails to adequately allege that Crestview, alone or as part of a control group, controlled USWS generally or specifically with respect to the Merger. Because the Amended Complaint fails to

---

agreement but the "Plaintiff offer[ed] no explanation for why [two investors] [we]re members of an alleged control group while the numerous other signatories" under the agreement were not).

39

allege that Crestview was a controller that owed fiduciary duties to USWS stockholders, Count II must be dismissed.[29]

### B. The Amended Complaint Does Not Otherwise Allege Facts Sufficient To Rebut The Business Judgment Rule.

Although the Merger was not a conflicted controller transaction, entire fairness still may apply "if the plaintiffs allege facts sufficient to rebut the business judgment rule." *Crimson Expl.*, 2014 WL 5449419, at *20. "Plaintiffs can rebut the presumption by showing the board was interested in the challenged transaction or lacked independence." *Id.* To successfully rebut the business judgment rule "in this manner, thereby leading to the application of the entire fairness standard, a plaintiff must normally plead facts demonstrating 'that a *majority* of the director defendants have a financial interest in the transaction or were dominated or controlled by a materially interested director.'" *Orman*, 794 A.2d at 22 (quoting *Crescent/Mach I P'rs, L.P. v. Turner*, 846 A.2d 963, 979 (Del. Ch. 2000)).

To meet their pleading burden, Plaintiffs must allege that at least five of USWS's nine directors were interested in, or lacked independence with respect to, the Merger.

---

[29] Because the Amended Complaint fails to allege that Crestview is a controller, I do not address Plaintiffs' allegations that Crestview received a non-ratable benefit in the Merger.

### 1. The Likelihood Of Personal Liability From Turnbull's Derivative Claims

Plaintiffs argue that seven of USWS's nine directors derived unique benefits from the Merger because it extinguished the potential derivative claims identified in Turnbull's 220 Demand. PAB 61–67. This argument fails because the Amended Complaint does not allege facts supporting a reasonably conceivable inference that the 220 Demand raised viable derivative claims, let alone claims presenting a likelihood of personal liability for any director.

Plaintiffs contend that the 220 Demand raised potential derivative claims against Crestview and members of the Board arising from the 2021 NPA, the Conversion, and the Term Loan Amendment. Am. Compl. ¶ 168.

The purported basis of both "claims" arising from the 2021 NPA and the Conversion is that Crestview failed to pay USWS *any* consideration for the benefits it received in those transactions. *See id.* ¶ 71 (alleging that USWS did not receive "any consideration for effectively doing away with the conversion limits under the Certificate of Designations for the Series A Preferred Stock or the conversion rights for the six million additional shares" under the 2021 NPA); *id.* ¶ 78 (alleging that "[t]he Company did not receive any consideration for the Additional Conversion Shares issued to Crestview, Matlin, and Treadwell"); *id.* ¶ 172 (describing the derivative claims as "a classic example of corporate looting"). The Amended Complaint does not allege facts supporting such an inference. To the contrary, the

41

Amended Complaint makes clear that in connection with the 2021 NPA, Crestview *purchased* $20 million in Equity Linked Notes *for cash* and another $20 million in Equity Linked Notes in exchange for the cancellation of 15,588 shares of Series A Preferred Stock, at a time when USWS faced liquidity challenges. Am. Compl. ¶ 66; Proxy at 83. The Amended Complaint also alleges that through the Conversion, USWS avoided paying 16% dividends on the Series B Preferred Stock. Am. Compl. ¶¶ 73–76. With no other allegations supporting viable derivative claims arising from these transactions, Plaintiffs fail to plead that such claims presented a likelihood of personal liability for any director, thereby impugning their disinterestedness in the Merger.

Plaintiffs also allege that the 220 Demand identified a potential derivative claim arising from the Term Loan Amendment. The basis for that claim is even weaker than the others. USWS clearly received consideration in connection with the Term Loan Amendment, in the form of an extension of credit. Plaintiffs argue, however, that it is "curious[]" that USWS was able to negotiate the Premiums down and suggests that this means "the Premium was structured as a hidden interest rather than an inducement." *Id.* ¶¶ 93–94. Even if true, Plaintiffs still do not explain how that supports a breach of fiduciary duty claim against any director.

Even if any of the potential derivative claims identified in the 220 Demand were viable, the Amended Complaint fails to allege that the value of such claims

was material to any particular director. Plaintiffs allege in conclusory fashion that the derivative claims were worth "tens of millions of dollars," but fail to plead any facts in support. *Id.* ¶ 190.[30] As a result, the Amended Complaint fails to adequately allege that any director derived a material benefit in the Merger by extinguishing derivative claims.

### 2. Habachy

Plaintiffs challenge Habachy's disinterestedness on the sole ground that the Merger extinguished derivative claims against him. *See* PAB at 67. Because the Amended Complaint fails to allege viable derivative claims, that argument fails.

### 3. O'Neill

Plaintiffs make no attempt to challenge the disinterestedness or independence of O'Neill, who is not named as a defendant in this action. *See* PAB 61–67; Am. Compl. ¶ 35.

### 4. Watson And Burnett

Plaintiffs' attempts to challenge the disinterestedness of Watson and Burnett, on the basis that they were beholden to Crestview, fail for the reasons already explained above. *See* PAB at 62–63, 64–65; *see also supra* pp. 27–30.

---

[30] *See City of Dearborn Police v. Brookfield Asset Mgmt. Inc.*, 2023 WL 5046772, at *2 (Del. Ch. June 21, 2023) (holding that plaintiffs' theory of damages for a derivative action that was extinguished in a merger was underdeveloped where plaintiffs failed to explain their damages calculations), *aff'd in part & rev'd in part on other grounds*, 314 A.3d 1108 (Del. 2024).

### 5. Broussard And Treadwell

Plaintiffs argue that the Amended Complaint "adequately alleges that Broussard was not independent and disinterested" with respect to the Merger because "Broussard was integral to the leadership of the Company at all times" in his role as "co-founder, President, and CEO prior to and following the de-SPAC Transaction until April 2022, and . . . as Chairman after April 30, 2022 through the closing of the Merger." PAB at 62 (citing Am. Compl. ¶¶ 22, 98). Plaintiffs' challenge to Broussard's independence fails because it rests on the false premise that Crestview controlled USWS.[31]

As for Treadwell, Plaintiffs seem to argue that he lacked independence from Matlin, TCW, and Crestview, which, in turn, had separate interests in the Merger. *See id.* at 65–66. To support that theory, Plaintiffs allege that "Treadwell, Matlin, TCW and Crestview spearheaded the de-SPAC Transaction that took USWS public";[32] Treadwell served with Matlin on the board of Flagstar Bancorp, Inc.; and

---

[31] *See Berteau v. Glazek*, 2021 WL 2711678, at *20 (Del. Ch. June 30, 2021) (concluding, where a complaint adequately pled the existence of a controller, that a director and officer lacked independence from the controller because the controller could influence his source of income); *Manti Hldgs., LLC v. Carlyle Gp., Inc.*, 2022 WL 1815759, at *12 (Del. Ch. June 3, 2022) (same); *In re Ezcorp, Inc. Consulting Agreement Deriv. Litig*, 2016 WL 301245, at *35 (Del. Ch. Jan. 25, 2016) (same).

[32] PAB at 65. Plaintiffs also allege that Treadwell did not vote on the de-SPAC Transaction or the Crestview Subscription Agreement. Am. Compl. ¶ 44. Even if true, that allegation does not support an inference that Treadwell recused based on a relationship with Matlin, TCW, or Crestview.

44

Treadwell also served with Carroll, a director of TCW, on the board of AGY Equity, LLC. Am. Compl. ¶¶ 24, 27, 120. These allegations of past business relationships with two other directors are "not enough to overcome the presumption of [Treadwell's] independence." *Orman*, 794 A.2d at 27; *see also Simons*, 2022 WL 223464, at *14 (rejecting the argument that a director lacked independence because he served as an executive with another individual for five years).

*      *      *

To summarize, the Amended Complaint does not impugn the disinterestedness or independence of at least six of the nine directors on the Board, and therefore fails to rebut the business judgment rule.

### C. The Amended Complaint Fails To State A Claim When Reviewed Under The Business Judgment Rule.

As set forth above, the Amended Complaint fails to adequately allege that Crestview was USWS's controlling stockholder. It also fails to allege that a majority of the Board was interested in or lacked independence with respect to the Merger. "Because the Board is exculpated from breaches of the duty of care, and because the Plaintiffs fail to adequate[ly] allege any director interest in the transaction, the Plaintiffs' remaining claims against the directors must be based on a breach of the duty of [loyalty to act in] good faith to survive." *In re BioClinica, Inc. S'holder Litig.*, 2013 WL 5631233, at *5 (Del. Ch. Oct. 16, 2013). Plaintiffs do not meet that pleading burden.

"A director acts in bad faith where he or she 'intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his or her duties.'" *USG Corp.*, 2020 WL 5126671, at *26 (quoting *van der Fluit*, 2017 WL 5953514, at *8). "Demonstrating that directors have breached their duty of loyalty by acting in bad faith goes far beyond showing a questionable or debatable decision on their part." *Friedman v. Maffei*, 2016 WL 1555331, at *12 (Del. Ch. Apr. 13, 2016) (quoting *Ironworkers Dist. Council of Phila. & Vicinity Ret. & Pension Plan v. Andreotti*, 2015 WL 2270673, at *27 (Del. Ch. May 8, 2015), *aff'd*, 132 A.3d 748 (Del. 2016)). "Even gross negligence, without more, does not constitute bad faith." *Crimson Expl.*, 2014 WL 5449419, at *23. "[I]t takes an 'extreme set of facts . . . to sustain a disloyalty claim premised on the notion that disinterested directors were intentionally disregarding their duties.'" *Id.* (citing *Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 243 (Del. 2009)).

The Amended Complaint alleges that the Director Defendants acted in bad faith by (1) approving the Merger for inadequate consideration and without adequately valuing potential derivative claims; (2) engaging a conflicted financial advisor; and (3) approving false and misleading disclosures in the Proxy.

### 1. Accepting Inadequate Merger Consideration And Failing To Value Potential Derivative Claims

Plaintiffs argue that the Director Defendants acted in bad faith by "accept[ing] [] inadequate Merger Consideration." PAB at 68. "Delaware law requires that for

46

an allegation of price inadequacy to support a bad faith claim, the Court would need to conclude that the 'price was so far beyond the bounds of reasonable judgment that it seems inexplicable on any ground other than bad faith.'" *Crimson Expl.*, 2014 WL 5449419, at \*23 (quoting *In re Alloy, Inc.*, 2011 WL 4863716, at \*12 (Del. Ch. Oct. 13, 2011)). "Plaintiffs have failed to allege facts from which this Court reasonably could find or infer that the exchange ratio here," representing a 67% premium to USWS's trading price, "satisfies this demanding standard." *Id.*

Plaintiffs further argue that the Director Defendants approved the Merger to extinguish the potential derivative claims arising from the 2021 NPA, the Conversion, and the Term Loan Amendment, and that the Director Defendants "deliberately failed to inform [themselves] of the value" of such claims. PAB at 68. But as discussed above, the Amended Complaint fails to allege facts supporting a reasonable inference that the purported derivative claims were viable, let alone that the Director Defendants consciously disregarded their duties by approving the Merger without valuing them. *See supra* pp. 41–43.

### 2. Engaging A Conflicted Financial Advisor

Plaintiffs allege that the Director Defendants acted in bad faith by engaging a conflicted financial advisor. As alleged in the Amended Complaint, while advising the Board, Piper Sandler also acted as an advisor to ProFrac on other matters. Am. Compl. ¶¶ 102–03, 119, 191. "[D]espite this manifest conflict of interest," the Board

47

continued to work with Piper Sandler and "never appears to have . . . considered engaging a different financial advisor." PAB at 8, 16–17. At best, these allegations state a claim for breach of the duty of care, but do not rise to the level of bad faith. *See, e.g.*, *Firefighters' Pension Sys. of Kan. City, Mo. Tr. v. Presidio, Inc.*, 251 A.3d 212, 284 (Del. Ch. 2021) (explaining that the directors' "decision to allow a conflicted and less-than-forthcoming [financial advisor] to advise the Board" did not support a reasonable inference of bad faith (cleaned up)); *In re Zale Corp. S'holders Litig.*, 2015 WL 5853693, at *17 (Del. Ch. Oct. 1, 2015) ("Making an inquiry initially to discover a financial advisor's conflicts, and later, upon being advised of a possible conflict, considering the implications of and remedies for that conflict as the Director Defendants did here, hardly constitutes the conscious disregard of the directors' duties required to demonstrate bad faith . . . .").

### 3. Approving False And Misleading Disclosures In The Proxy

Plaintiffs also contend that the Director Defendants acted in bad faith by approving false and misleading disclosures in the Proxy.

"When obliged by law to disclose, a director's fiduciary duties require that she 'disclose fully and fairly all material information within [her] control.'" *Flannery*, 2021 WL 3615540, at *26 (citing *In re Solera Hldgs., Inc. S'holder Litig.*, 2017 WL 57839, at *9 (Del. Ch. Jan. 5, 2017)). "To survive a motion to dismiss, the plaintiffs must provide some basis for a court to infer that the alleged violations

48

were material. For example, a pleader must allege that facts are missing from the statement, identify those facts, state why they meet the materiality standard and how the omission caused injury." *BioClinica*, 2013 WL 5631233, at *8 (citing *Malpiede v. Townson*, 780 A.2d 1075, 1086–87 (Del. 2001)). "An omission is material if 'there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote.'" *Id.* (quoting *Arnold v. Soc'y for Sav. Bancorp, Inc.*, 650 A.2d 1270, 1277 (Del. 1994) (emphasis removed)).

Here, Plaintiffs must plead "facts with respect to the omissions from which I may reasonably infer breach of the duty of loyalty, and not simply adequate pleading of a material omission." *Morrison v. Berry*, 2019 WL 7369431, at *18 (Del. Ch. Dec. 31, 2019). "Bad faith, in the context of omissions, requires that the omission be intentional and constitute more than an error of judgment or gross negligence." *Id.*

Plaintiffs contend that the Proxy failed to disclose (1) that Crestview representatives and USWS management attended certain Board and Special Committee meetings and (2) Piper Sandler's conflicts of interest. Am. Compl. ¶¶ 189–193. As explained below, Plaintiffs fail to allege a false or misleading disclosure, let alone bad faith on the part of the Director Defendants.

49

### a. Crestview And USWS Management's Attendance At Additional Meetings

Plaintiffs contend that the Proxy was materially misleading because it "failed to disclose the participation of conflicted individuals at meetings of the Board and Special Committee." PAB at 55. Specifically, Plaintiffs allege that the Proxy did not disclose that USWS management, including O'Neill and Simonson, "attended the June 15 meeting of the Special Committee, as well as the final meeting on June 20, 2022 at which the Special Committee approved the Merger." Am. Compl. ¶ 189. In addition, Plaintiffs allege that the Proxy did not disclose that Crestview representatives attended Board meetings on May 31, 2022 and June 6, 2022, or describe a Board meeting with USWS management and Crestview in attendance, during which Piper Sandler informed the Board of its engagements with ProFrac. *Id.* ¶¶ 105, 111, 130–31.

Plaintiffs fail to explain why, in the context of extensive disclosures describing Crestview and USWS management's role in the Merger process, their attendance at these additional meetings would be material. The Proxy disclosed that Crestview attended at least two, and USWS management attended at least seven, Special Committee and Board meetings throughout the process. Proxy at 81–93. Without additional allegations that Crestview, O'Neill, or Simonson said or did something important at those meetings, the fact that they attended adds nothing. *See In re Cyan, Inc. S'holders Litig.*, 2017 WL 1956955, at *11 (Del. Ch. May 11, 2017)

50

("[T]he materiality standard does not require a blow-by-blow description of events leading up to the proposed transaction." (quoting *Matador Cap. Mgmt. Corp. v. BRC Hldgs., Inc.*, 729 A.2d 280, 295 (Del. Ch. 1998))); *Abrons v. Maree*, 911 A.2d 805, 813 (Del. Ch. 2006) ("Delaware courts must 'guard against the fallacy that increasingly detailed disclosure is always material and beneficial disclosure.'" (quoting *Zirn v. VLI Corp.*, 1995 WL 362616, at *4 (Del. Ch. June 12, 1995), *aff'd*, 681 A.2d 1050 (Del. 1996))). That is particularly true given Plaintiffs' failure to allege that either O'Neill or Simonson were interested in or otherwise conflicted with respect to the Merger.

### b. Piper Sandler's Conflicts Of Interest

Plaintiffs also argue that "[t]he Proxy failed to disclose the full extent of Piper Sandler's conflicts." PAB at 56.

Plaintiffs concede that the Proxy fully disclosed Piper Sandler's prior engagements with ProFrac "as of the final June 20 meeting." *Id.* (citing Am. Compl. ¶ 191). They argue, however, that the Proxy "failed to adequately disclose Piper Sandler's relationships with . . . other holdings of the Wilks Family." *Id.* (citing Am. Compl. ¶ 192). The Proxy disclosed that:

> *Piper Sandler has provided a variety of financial advisory services* to ProFrac and *to parties with significant investments in ProFrac*, including: (i) acting as co-manager in arranging a senior secured credit facility for ProFrac in 2018; (ii) advising an entity on the sale of a large undeveloped property to ProFrac in 2021; (iii) advising an entity on the sale of such entity's preferred equity held by a third party to ProFrac in

51

2022; (iv) selling a minority equity stake in an entity to ProFrac in 2022; (v) advising an entity regarding a long-term supply agreement with ProFrac in return for convertible preferred equity securities of ProFrac in 2022; (vi) serving as exclusive financial advisor on ProFrac's acquisition of an entity in 2022; (vii) acting as sole debt placement agent in arranging a senior secured term loan for ProFrac in 2022 to fund a portion of ProFrac's acquisition described in the preceding clause; (viii) acting as sole debt placement agent in 2022 in arranging two upsizes of ProFrac's existing revolving credit facility; and (ix) serving as an active bookrunner on ProFrac's initial public offering in 2022. With respect to the services described in clauses (i), (vi), (vii), (viii) and (ix), Piper Sandler realized aggregate gross fees of approximately $12.5 million.

Proxy at 122 (emphasis added). Although the Amended Complaint includes a chart entitled "Overview of Transaction Relationships with Wilks Family," neither the Amended Complaint nor Plaintiffs' briefing specifically identifies any "transaction relationship" between Piper Sandler and the Wilks Brothers that should have been, but was not, disclosed. Am. Compl. ¶ 192.

Plaintiffs also contend that the Proxy failed to disclose Piper Sandler's four "ongoing engagements with ProFrac[,]" including that Piper Sandler served (a) "[a]s advisor to ProFrac in a buyside acquisition under binding purchase agreement for a sand mine;" (b) "[a]s advisor to ProFrac for a DCM process to upsize its term loan and evaluate future refinancing options;" (c) "[w]ith [Frank Henry Equipment ('FHE')] for the evaluation of its strategic options (ProFrac owned preferred equity in FHE);" and (d) "[w]ith Flotek in evaluating strategic options where ProFrac was a potential investor and already held convertible preferred equity." Id. ¶ 191. Piper

Sandler's fairness opinion, attached to the Proxy at Annex D, did, in fact, disclose those engagements:

> We are currently engaged by the Acquiror (i) as its financial advisor in connection with its acquisition of Signal Peak Silica's Monahans sand mine, which acquisition was announced by Acquiror on June 21, 2022 (see footnote 1) and (ii) as its placement agent to upsize its existing term loan and evaluate further debt refinancing options. We are also currently separately engaged by two entities, in each of which the Acquiror has an equity interest, to evaluate strategic options and capital-raising options, and with respect to the engagement that includes capital-raising options, Acquiror is a potential investor.

Proxy at D-3. Again, Plaintiffs fail to identify any facts about these engagements that should have been, but were not, disclosed.[33] *See, e.g.*, *Wayne Cty. Empls.' Ret. Sys. v. Corti*, 954 A.2d 319, 334 (Del. Ch. 2008) (rejecting disclosure claim where "[t]he definitive proxy and the . . . fairness opinion, which [wa]s appended to the definitive proxy statement as Annex D, already disclose[d]" the information at issue and it was therefore "unclear what, exactly, plaintiff still believe[d] [wa]s missing"); *Coates v. Netro Corp.*, 2002 WL 31112340, at *4 (Del. Ch. Sept. 11, 2002) (rejecting disclosure claim where "[a]ll the necessary information was available to the

---

[33] Plaintiffs premise this disclosure claim on the Delaware Supreme Court's recent decisions in *City of Dearborn Police & Fire Revised Retirement System*, 314 A.3d at 1108, and *City of Sarasota Firefighters' Pension Fund v. Inovalon Holdings, Inc.*, 319 A.3d 271 (Del. 2024). Those decisions do not support Plaintiffs' claim here because the conflicts at issue here were, in fact, disclosed to stockholders.

shareholders, and the shareholders were directed to refer to those documents"
attached to the proxy).[34]

*      *      *

For the reasons discussed above, the Amended Complaint fails to adequately allege that the Director Defendants acted in bad faith. Count I must be dismissed.

## III. CONCLUSION

For the reasons explained above, the Motions to Dismiss are GRANTED and the Amended Complaint is DISMISSED.

---

[34] The Amended Complaint also alleges that the Proxy failed to disclose the potential derivative claims identified in the 220 Demand, but because the Amended Complaint fails to allege that such claims were viable, the failure to disclose them cannot support a material omission. *See supra* pp. 41–43. In addition, the Amended Complaint alleges that "[t]he Proxy did not disclose a reconciliation of the impact that the adjustments to the conversion price of Crestview's Series A Preferred Stock and PIK Notes contemplated by the Crestview IOI would have on Crestview's equity stake in the Company." Am. Compl. ¶ 193. Plaintiffs abandoned that argument in briefing and it is therefore waived. *See, e.g., Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived"). Even if it were not, the Proxy disclosed that information. *See* Proxy at 123. Plaintiffs do not explain what else should have been disclosed or why such additional information was material.

54